IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

**GROVER GUILFORD,**
**Plaintiff,**

vs.                                                   Case No. 5:13cv350/MP/MD

**CAROLYN W. COLVIN,**
**Action Commissioner of the**
**Social Security Administration,**
**Defendant.**

_____

**REPORT AND RECOMMENDATION**

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes. It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant Guilford's application for Supplemental Security Income benefits under Title XVI of the Act.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## PROCEDURAL HISTORY

Mr. Guilford filed an application for benefits claiming an onset of disability as of January 1, 2009. The application was denied initially and on reconsideration, and Mr. Guilford requested a hearing before an administrative law judge (ALJ). A hearing was held on December 19, 2011 at which Mr. Guilford was represented by counsel and testified. A vocational expert also testified. The ALJ entered an unfavorable decision on June 15, 2012 (tr. 23-36), following which Mr. Guilford requested review by the Appeals Council without submitting additional evidence. The Appeals Council declined review (tr. 1-6). The Commissioner has therefore made a final decision, and the matter is subject to review in this court. *Ingram v. Comm'r of Soc. Sec. Admin*, 496 F.3d 1253, 1262 (11th Cir. 2007); *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998). This timely appeal followed.

## FINDINGS OF THE ALJ

Relative to the issues raised in this appeal, the ALJ found that Mr. Guilford had not engaged in substantial gainful activity since March 25, 2010; that he had severe impairments of left knee meniscal tear, left ankle tenosyovitis and tendon tear, lumbago, major depressive disorder, schizoaffective disorder, and borderline intellectual functioning, but that he did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1; that he had the residual functional capacity to perform light work with some postural limitations and was further limited to simple, routine tasks with simple, work related decisions and few, if any, work place changes; that he could not perform his past relevant work as kitchen helper, lumber straightener, or carpet layer helper; that he was 39 years old, a younger individual; that he had limited education and could communicate in English; that there are jobs that exist in significant numbers the national economy that he can perform; and that

he has not been disabled as defined in the Act from March 25, 2010, the date of his application.

## STANDARD OF REVIEW

In Social Security appeals, this court must review de novo the legal principles upon which the Commissioner's decision is based. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). There is no presumption that the Commissioner followed the appropriate legal standards in deciding a claim for benefits, or that the legal conclusions reached were valid. *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002). Failure either to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007).

The court must also determine whether the ALJ's decision is supported by substantial evidence. *Moore*, 405 F.3d at 1211 (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)). Even if the proof preponderates against the Commissioner's decision, it must be affirmed if supported by substantial evidence. *Ingram*, 496 F.3d at 1260; *Miles*, 84 F.3d at 1400. Substantial evidence is more than a scintilla but less than a preponderance, and encompasses such relevant evidence as a reasonable person would accept as adequate to support a conclusion. *Moore*, 405 F.3d at 1211 (citation omitted). In determining whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence. *Moore*, 405 F.3d at 1211 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). Findings of fact of the

Commissioner that are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g); *Ingram*, 496 F.3d at 1260.

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security regulations establish a five-step evaluation process to analyze claims for both SSI and disability insurance benefits. *See Moore,* 405 F.3d at 1211; 20 C.F.R. § 416.920 (2009) (five-step determination for SSI); 20 C.F.R. § 404.1520 (2009) (five-step determination for DIB). A finding of disability or no disability at any step renders further evaluation unnecessary. *See* 20 C.F.R. § 416.920; 20 C.F.R. § 404.1520. The steps are:

1. Is the claimant currently engaged in substantial gainful activity?
2. Does the claimant have any severe physical or mental impairment that meets the duration requirement?
3. Does the claimant have any severe impairments that meet or equal those listed in Appendix 1 to subpart P of 20 C.F.R. Part 404 and meet the duration requirement?
4. Considering the claimant's residual functional capacity, can the claimant perform past relevant work?
5. Can the claimant perform other work given the claimant's residual functional capacity, age, education and work experience?

*Id.*

**These regulations place a very heavy burden on the claimant to demonstrate both a qualifying impairment or disability and an inability to perform past relevant work.** *Moore,* 405 F.3d at 1211 (citing *Spencer v. Heckler,* 765 F.2d 1090, 1093 (11th Cir.1985)). If the claimant establishes such an impairment, the burden shifts to the Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Allen v. Bowen,* 816 F.2d 600, 601 (11th Cir. 1987). If the Commissioner carries this burden, claimant must prove that he cannot perform the work suggested by the Commissioner. *Doughty,* 245 F.3d at 1278 n.2; *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## PLAINTIFF'S MEDICAL HISTORY

A. Physical Health History

Mr. Guilford was afforded treatment at the Jackson County, Florida, Health Department ("Health Department") from May 9, 2008 through August 29, 2011 (tr. 327-46, 379-88). In addition to routine minor illnesses, Mr. Guilford complained of low back pain in the spring of 2008, a left knee injury in March, 2010 and a left ankle injury in June, 2010. His treatment was generally conservative. On February 22, 2010, Mr. Guilford was seen at the Jackson Hospital Emergency Room complaining of low back pain. He was noted to be normal in all aspects, including his psychological state, other than the pain in his back (tr. 274). A lumbar MRI showed minimal facet effusion, otherwise unremarkable (tr. 281). He was given medication and told to apply heat, to move as tolerated, and to follow up with his regular provider (tr. 276).

On April 16, 2010, Mr. Guilford was seen at the Health Department complaining of knee and ankle pain due to a fall. The medical record noted that ten years earlier, in May of 2000, Mr. Guilford had injured his knee and was scheduled for surgery in January 2001, but the surgery was apparently never done. He was referred for an MRI (tr. 335-36). The MRI of his left knee disclosed a small tear on the anterior horn of

the lateral meniscus with a cyst, but no swelling (tr. 346). He continued to complain of ankle pain, and a June 4, 2010 MRI showed a severe split tear of the peroneus brevis tendon, chronic appearing, with mild swelling (tr. 343). On July 2, 2010, the Health Department provider indicated "write prescription for a cane" and wrote a letter stating that the patient was excused from work that required long standing or long walking (tr. 338). On September 2, 2010, Mr. Guilford indicated that he desired surgery on his ankle and was discussing an indigent plan with Jackson Hospital (tr. 339).

On September 2, 2010, Dr. Chantornsaeng, Mr. Guilford's provider at the Health Department, filled out a form relative to child support enforcement. He noted that he had been treating Mr. Guilford since 2008, that the patient was not totally and permanently disabled, that he could not presently work and would not be able to work until a year later, and then only part time (tr.348).

The Commissioner referred Mr. Guilford for an independent physical examination by Samuel Ward, MD, who saw him on May 13, 2010. Dr. Ward noted an abnormal gait due to left knee and ankle pain, and stated that Mr. Guilford needed, but did not use, an assistive device to walk or stand, and was not able to do heel/toe walking due to pain (tr. 288).

At the administrative hearing in December of 2011, Mr. Guilford testified that he had a drivers license but the test for the license was verbal because he could not read or write, that he could read some traffic signs, and that he drove off and on (tr. 51-2). He used a cane all the time because of weakness and pain in his left leg. He fell several times (tr. 57-58). He said his back was "doing okay a little bit off and on," and had good days and bad days (tr. 61). His main problem was his ankle (tr. 62-63).

B. Mental Health History

At the time of his initial application for SSI benefits, Mr. Guilford indicated that he was disabled due to back, knee and left ankle pain and a learning disability (tr. 260). Significantly, he made no mention of mental health problems like depression, suicidal ideation or hallucinations.

Mr. Guilford was referred by the Commissioner to Paul Tritsos, Psy. D. for a mental status examination. Dr. Tritsos noted that Mr. Guilford denied a history of mental health related treatment but said he had an appointment with Life Management Center (LMC) the following week. He complained of depression, including crying spells and pessimism. He had worked as a dishwasher but was fired for being too slow. He said he had spent five years in prison due to problems with drugs. He could do basic household chores and hygiene maintenance. His girlfriend helped him with getting dressed and managing money. He denied any history of head trauma or hallucinations and further denied suicidal or homicidal ideation, plans or intentions. Dr. Tritsos noted school records showing IQ tests in the 1970's and 1980's with scores ranging from 60 to 86. Among other tests, Mr. Guilford was unable to spell WORLD and could not name the last five presidents. He "glazed over" and could not do serial three calculations from 100. Dr. Tritsos' diagnostic impression was adjustment disorder with depression and anxiety and borderline intellectual functioning (tr. 292-93).

On June 1, 2010, twelve days after effectively telling Dr. Tritsos he had no psychoses, Mr. Guilford told intake at LMC that he was depressed and had auditory hallucinations occasionally and visual hallucinations frequently, poor concentration, suicidal ideation, insomnia and fatigue. He reported frequent thoughts of falling off a cliff and landing on a sharp object that goes through his back. The conditional diagnosis was major depression with psychotic features (tr. 294-304).

Mr. Guilford returned to LMC for his initial psychiatric evaluation on October 18, 2010. He was evaluated by Omar Howard, MD, a psychiatrist. Mr. Guilford reported depression over many years, low mood, anhedonia–the inability to experience pleasure from activities usually found enjoyable–and poor sleep. He felt paranoid and anxious. He reported getting nervous and pulling his hair and scratching himself. He denied current suicidal ideation but had thoughts of death often. He once attempted suicide by trying to have a car hit him. He said he had been to jail but could not remember why, and said he had multiple legal problems,

including drugs. He denied any violent crimes. Dr. Howard's diagnosis was major depressive disorder, single episode, severe with psychotic features, and schizoaffective disorder. He prescribed Haldol, cogentin and celexa (tr. 361-378).

Mr. Guilford was seen monthly by a nurse practitioner over the next six months (he missed one appointment) and was generally noted to be doing better, being more talkative, and reporting that his medications were working. He also reported anger and continued visual hallucinations (tr. 361-374). Then, on June 6, 2011, he appeared at LMC saying he was depressed and had thoughts of wanting to hurt himself.

He was admitted to the Emerald Coast Behavioral Hospital under Florida's Baker Act, Fla. Stat. § 394.451 *et. seq.* Bhaskar Arya, MD, the admitting psychiatrist, noted that Mr. Guilford "supposedly" had a history of schizoaffective disorder over the past year. He had two empty bottles of tramadol and Flexeril that had been filled that morning. He had been living with his girlfriend and her children, but she had kicked him out and locked the door, apparently relative to an investigation on injuries to her children. He then went to live with his brother, but his brother had kicked him out the week prior. He then lived under bridges and in peoples' sheds. He finally went to LMC and told them he was suicidal because he was homeless.

Mr. Guilford reported that he tried to poke himself in the neck but failed. He thought about walking into traffic, but went to LMC instead. He said he was severely depressed and suicidal. He heard his deceased parents and other dead people talking to him, but he could not give any particulars about how intense the experience was, how it affected him, whether he heard voices on one side of his head or the other, or from inside. Dr. Arya noted that the inability to give details implied that he was "just verbalizing things without actually having them occur on him." (Tr. 391-92). Dr. Arya then stated that Mr. Guilford had never actually attempted suicide, that he was "suicidal now, but was only suicidal yesterday and not today and that he is seeking to have a place to live as he is homeless." (Tr. 392).

Dr. Arya stated that onset of hallucinations at Mr. Guilford's age was known to occur but was uncommon, and with his inability to give details, "it is more likely that he is making false claims rather than actual schizophrenia." (*Id.*).

During his hospitalization, Mr. Guilford's medications were changed. Tramadol and Flexeril was discontinued, Haldol was increased, and Cogentin and trazodone were added. Mr. Guilford was discharged from the hospital after three days. At discharge he was basically normal mentally and was not complaining of pain. He had agreed to move in with a friend, and was given a ride to his friend's home.

The last three recorded visits to LMC during the summer and fall of 2011 indicated that new medication were helping, he was better and "doing good." (Tr. 398-405).

After the administrative hearing, the Commissioner referred Mr. Guilford to a psychologist, Cara Wheeler, Psy.D., for a consultative examination, which was done on January 24, 2012. Dr. Wheeler reviewed documentation from Dr. Tritsos, LMC and Dr. Arya. The WAIS-IV showed a full scale IQ of 60. His verbal score was 56 with a 95% confidence interval of 52-63. The final diagnosis was "Malingering" with Schizoaffective Disorder (by history) and mild mental retardation (provisional). Mr. Guildford told Dr. Wheeler that he had served ten years for possession of crack cocaine (tr. 412). Dr. Wheeler noted a conflict regarding diagnosis because of suspicion of malingering. She felt there were genuine mental health issues, including extremely low intellectual ability, but there was evidence of exaggerating psychotic symptoms. Dr. Wheeler could not judge Mr. Guilford's ability to perform on a daily basis because of the confounding factors (Tr. 411-15).

## DISCUSSION

Mr. Guilford argues that the ALJ erred in (1) failing to find that he met the criteria for Listing 12.05B or 12.05C, (2) failing to include certain mental and physical limitations in his residual functional capacity finding and the hypothetical question he posed to the VE, and (3) finding him not credible. Mr. Guilford contends that he was disabled from his onset date. The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained. The issue thus presented is whether the ALJ's decision that Mr. Guilford was not disabled, in light of his physical and mental condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

   1.   <u>Credibility.</u>

Although Mr. Guilford makes the issue of credibility his third claim of error, credibility is the overarching issue in this case. In her decision, the ALJ cited multiple instances of doubt concerning Mr. Guilford's credibility, including the unlikely sudden onset of psychosis at age 41; the subsequent discounting of any psychosis by both Dr. Arya ("just verbalizing" rather then experiencing) and Dr. Wheeler; diagnoses and notations of malingering and probable malingering; being Baker Acted as suicidal when, by his own admission, he was just homeless and looking for a place too live; claiming inability to read and write but reporting reading his Bible; Dr. Ward finding no significant objective evidence to corroborate alleged physical limitations; telling Dr. Wheeler he had served ten years for possession of crack cocaine[1] after earlier telling providers of incarceration for short periods

---

[1] Florida department of Corrections records show that in November, 2002, Grover Guilford, of Jackson County, Florida, DOB 01/30/71 (same DOB as plaintiff here) was sentenced to four years, six months in prison for selling or possessing with intent to sell cocaine withing 1000 feet of a school. He also had a prior burglary conviction, and one for aggravated assault with a weapon, which contradicts his statement to Dr. Howard that he had no prior violent offenses.
http://www.dc.state.fl.us/inmatereleases/detail.asp?Bookmark=1&From=list&SessionID=903727864

*Case No: 5:13cv350/MP/MD*

because of drugs, and in one instance saying he could not recall why he had been incarcerated; conservative medical treatment; failure to claim any psychosis in his original application; and, inconsistencies in his activities of daily living.

There was more than enough contradicting evidence to support the ALJ's finding that Mr. Guilford's various claims, discussed below, were not credible. Mr. Guilford is not entitled to reversal on this ground.

### 2. Listing 12.05B or 12.05C

Mr. Guilford contends that he should have been found disabled at step 3 because of his IQ scores. The regulations promulgated by the Commissioner at Appendix 1, Subpart P, set out specific physical and mental conditions that are presumptively disabling. If a claimant meets the requirements of one of the listings, no further proof of disability is required. *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).

The Commissioner's listing at 12.05B and 12.05C effective at the time of the ALJ's decision provided as follows:

> 12.05  *Mental Retardation*:  Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A. B. C. or D. are satisfied.
>
> * * *
>
> B.  A valid verbal, performance, or full scale IQ of 59 or less:
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

Before addressing this issue directly, it is necessary to consider a point Mr. Guilford argues concerning certain nomenclature.  He contends that the ALJ erred in finding that "at no time was the claimant assessed as mildly mentally retarded; rather, he was assessed with borderline intellectual functioning." (Tr 26).[2]  Still, this is a red herring.  The change in the regulations relied on by Mr. Guilford became effective in September, 2013 (Plaintiff's Memorandum, p. 20), *after* the ALJ's decision of June 15, 2012.  Moreover, the distinction is immaterial.  The regulation quoted above was amended deleting the first two words, *Mental Retardation,* and replacing them with the words *Intellectual Disability.*  The remainder of the regulation was unchanged.  Mr. Guilford's contention that it somehow made a difference that the DSM-V made the same change is misplaced.  The DSM-V was also released in September, 2013, *after* the ALJ's decision.

And it does not matter.  The ALJ's notation that Mr. Guilford was not diagnosed as mentally retarded appeared in the ALJ's discussion of the school records and the placement of Mr. Guilford in classes for learning disabled students, not with the mentally retarded.  Decisions by school administrators from almost thirty years earlier have little probative value, if any.  Moreover, the new term "Intellectual Disability" is not the same as borderline intellectual functioning, which was the diagnosis made by Dr. Tritsos (tr. 293).

The change in nomenclature aside, the ALJ did not err in finding that Mr. Guilford failed to meet the requirements of either section of Listing 12.05.  The introductory language of Listing 12.05 requires "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22."  Mr. Guilford says he became disabled in 2009 and testified that he had worked as a dishwasher and lumber worker before that time.

---

[2]This is incorrect.  Dr. Wheeler diagnosed Mild Mental Retardation (provisional) (tr. 415).

Thus, it cannot be said that deficits in adaptive functioning initially manifested before age 22. Both parties agree that Mr. Guilford's school IQ scores are too remote in time to be relied upon to show current IQ scores. Mr. Guilford argues that the real issue is whether the scores from 2011 are sufficient to support a finding of disabled.

Dr. Wheeler administered the WAIS-IV and found a verbal IQ of 56, which is the only score that potentially meets the requirements of Listing 12.05B ("A valid verbal, performance ot full score IQ of 59 or less."). Dr. Wheeler clearly had doubts about the extent of Mr. Guilford's ability to function on a daily basis (tr. 415). She did not say that the 56 verbal score was invalid, but neither did she say it was valid. Mr. Guilford's scores ranged from 56 to 74. The 95% confidence interval (akin to a margin of error) for the verbal 56 IQ score was 52-63. And, "the ALJ [is] not required to find that [plaintiff] was mentally retarded based on the results of the IQ test. The ALJ is required to examine the results in conjunction with other medical evidence and the claimant's daily activities and behavior." *Popp v. Heckler*, 779 F.2d 1497, 1500 (11th Cir. 1986); *see also Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998) (citing cases). Thus, the test results must be examined to assure consistency with daily activities and behavior. *Popp,* 779 F.2d at 1499.

One of the introductory paragraphs to Listing 12.00 states: "[S]ince the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." 20 CFR pt. 404, subpt. P. App. 1 § 12.00 D 6. There was no such comment by Dr. Wheeler on the validity of the scores. Indeed, she expressed doubt about Mr. Guilford's mental health. Mr. Guilford argues that this does not apply to the IQ score, and it may not, but Mr. Guilford has the burden of showing that the ALJ's decision was unsupported by the evidence. *Ingram v. Comm'r of Soc. Sec.,* 496 F.3d 1253, 1260 (11th Cir. 2007). Even if the proof preponderates against the

Case No: 5:13cv350/MP/MD

Commissioner's decision, it must be affirmed if supported by substantial evidence. *Id*.

Substantial evidence supports the ALJ's decision. Mr. Guilford's single 56 score is not "consistent with the developmental history and the degree of functional limitation." 20 CFR pt. 404, subpt. P. App. 1 § 12.00 D 6. He had a drivers license, drove a car, worked, had a family, had a savings account, and lived independently. At the hearing he could name the doctors who told him to use a cane and knew which of his medications came from which clinic. His IQ scores as a teenager, while not binding or valid for a decision at his current age, are relevant to show that even then, none of his scores were 59 or lower (tr. 292). While the ALJ's decision can be questioned, the undersigned cannot say, given the extent of Mr. Guilford's daily activities and his obvious lack of credibility, that the ALJ erred. Mr. Guilford is not entitled to relief on this ground.

The same conclusion is reached as to Listing 12.05C, which requires an IQ a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Assuming the IQ scores of 60 and above are valid, Mr. Guilford still has not shown that the ALJ erred in her finding. The ALJ found that Mr. Guilford's daily activities and lack of credibility weighed strongly against accepting his claims of physical disability. While there was objective medical evidence of knee and ankle problems, the question of whether those conditions caused sufficient pain to be disabling is reserved to the Commissioner.

As this court is well aware, pain is treated by the Regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." *Accord* 20 C.F.R. § 416.929. The Eleventh

Circuit has articulated the three-part pain standard, sometimes referred to as the *Hand*[3] test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Adamo v. Commissioner of Social Sec.,* 365 Fed. Appx. 209, 2010 WL 476691, *3+ (11th Cir. 2010) (quoting *Wilson*) (Table, text in WESTLAW); *Elam v. Railroad Retirement Bd.*, 921 F.2d 1210, 1216 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard." *Wilson, supra*, 284 F.3d at 1226. Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." *Elam*, 921 F.2d at 1215. The Eleventh Circuit has held that "pain alone can be disabling, even when its existence is unsupported by objective evidence." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995)(citing *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992)); *Walker v. Bowen*, 826 F.2d 996, 1003 (11th Cir. 1987); *Hurley v. Barnhart*, 385 F.Supp.2d 1245, 1259 (M.D.Fla. 2005). However, the presence or absence of evidence

---

[3]*Hand v. Bowen*, 793 F.2d 275, 276 (11th Cir.1986) (the case originally adopting the three-part pain standard).

to support symptoms of the severity claimed is a factor that can be considered. *Marbury*, 957 at 839-840;  *Tieniber v. Heckler,* 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, if the Commissioner refuses to credit subjective testimony of the plaintiff concerning pain, he must do so explicitly and give reasons for that decision. *MacGregor v. Bowen,* 786 F.2d at 1054.  Where he fails to do so, the Eleventh Circuit has stated that it would hold as a matter of law that the testimony is accepted as true.  *Holt v. Sullivan,* 921 F.2d at 1223; *MacGregor v. Bowen,* 786 F.2d at 1054. Although the Eleventh Circuit does not require an  explicit finding as to a claimant's credibility, the implication must be obvious to the reviewing court.  *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005).  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection insufficient to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole.  *Dyer,* 395 F.3d at 1210 (11th Cir. 2005) (internal quotations and citations omitted).  And of course, the reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence.  *Wilson,* 284 F.3d at 1225-1226; *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991); *Hurley,* 385 F.Supp.2d at 1259.

Underlying the *Hand* standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." *Scharlow v. Schweiker*, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[4]  People with objectively identical conditions can experience

---

[4] Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  *Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ." *Hand, supra,* at 1548-49. It is within the ALJ's "realm of judging" to determine whether "the quantum of pain [a claimant] allege[s] [is] credible when considered in the light of other evidence." *Arnold v. Heckler*, 732 F.2d 881, 884 (11th Cir. 1984). Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the physician's opinion is not binding on the ALJ. The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief or the plaintiff's claims, is the basis for the ALJ's credibility determination.

Here the ALJ did not hint at lack of credibility, she made a specific finding, supported by substantial record evidence as discussed above, that Mr. Guilford's claims of disabling pain was not credible (tr. 31). Mr. Guilford is not entitled to reversal on this ground.

3.   **Improper Hypothetical.**

In his remaining ground for relief, Mr. Guilford contends that the ALJ erred in not including the need for an assistive device–a cane–as part of Mr. Guilford's limitations. He argues that the ALJ did not mention the cane and did not explain why he did not. But as with the pain standard discussed above, the ALJ was not required to accept the cane as necessary to Mr. Guilford's functioning. Dr. Ward indicated that Mr. Guilford needed a cane, an opinion that was obviously based on Mr. Guilford's claim of disabling pain in his leg. On examination, Dr. Ward made findings of normal motor strength in all extremities, and normal reflexes. He noted Mr. Guilford's abnormal gait and said he needed a cane (tr. 288), but as with any finding concerning pain, it was not for Dr. Ward to decide whether Mr. Guilford's leg

pain was great enough to require a cane. That is a credibility decision reserved to the Commissioner. *Arnold v. Heckler*, 732 F.2d 881, 884 (11th Cir. 1984).

The ALJ discounted Mr. Guilford's subjective complaints of pain. As noted above, credibility is at the center of this case, and the ALJ found Mr. Guilford to be not credible. The ALJ's hypothetical assumed a person "who is capable of performing light work, who can frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl, who can occasionally climb ladders, ropes and scaffolds." (Tr. 72). The hypothetical itself made it clear that the ALJ had found that Mr. Guilford did not need a cane.

Plaintiff testified that he used the cane mainly for balance (Tr. 354). However, as the Commissioner points out (doc. 19, p. 20), two of the jobs the vocational expert indicated Mr. Guilford could perform–housekeeping and seconds handler–did not require balancing or exposure to high places. The seconds handler job also does not require stooping, climbing, kneeling, crouching or crawling. Thus, even if Mr. Guilford had either pain or problems with balance, he was not excluded from performing at least one of those jobs. Again, Dr. Ward indeed noted a limp and accepted Mr. Guilford's subjective complaints of pain, but it was within the ALJ's realm of judging to discount Dr. Ward's opinion. Mr. Guilford is not entitled to reversal on this ground.

Accordingly, it is respectfully RECOMMENDED that the decision of the Commissioner be AFFIRMED, that this action be DISMISSED and that the clerk be directed to close the file.

At Pensacola, Florida this 23rd day of February, 2015.

/s/ *Miles Davis*
      **MILES DAVIS**
      **UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings.  See 28 U.S.C. § 636; *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir. 1988).**